# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **BIG BOB'S FLOORING OUTLET OF AMERICA, INC.,** **FLOORS & MORE, LLC, and VINCENT VIRGA,** Petitioners, | ) ) ) ) ) ) ) CIVIL ACTION ) NO. 20-11379-TSH ) ) ) ) |
| v. | |
| **JOSEPH ELYACHAR and MICHAEL ELYACHAR,** Respondents. | |

| | |
|---|---|
| **FLOORS & MORE, LLC, and VINCENT VIRGA,** Petitioners, | ) ) ) ) ) ) CIVIL ACTION ) NO. 20-11381-TSH ) ) ) ) ) |
| v. | |
| **BIG BOB'S OUTLETS OF KANSAS CITY, INC.,** **and DAVID ELYACHAR,** Respondents. | |

## MEMORANDUM OF DECISION AND ORDER
### September 30 , 2021

**Hillman, J.**

## Background

In the first action, Big Bob's Flooring Outlet of America, Inc. ("BBOA"), Floors and

More, LLC ("FAM"), and Vincent Virga ("Virga" and together with BBOA and FAM, the

"BBOA Litigants") have petitioned the Court pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, to compel Joseph Elyachar ("Joseph") and Michael Elyachar ("Michael") to arbitrate all claims arising under or related an alleged arbitration agreement between the parties. This Memorandum of Decision and Order addresses Defendants' Motion to Dismiss (Docket No. 9). For the reasons set for the below, that motion is *granted.*

In the second action, Virga and FAM have petitioned the Court pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, to compel Big Bob's Outlet of Kansas City, Inc. ("BBKC") and David Elyachar ("David") to arbitrate all claims arising under or related an alleged arbitration agreement between the parties. This Memorandum of Decision and Order addresses Defendants' Motion to Dismiss Under Fed.R.Civ.P. 12(b)(1) (Docket No.12). For the reasons state below, that motion is *granted*.

Following is a summary of the relationship between the parties and the various proceedings presently pending among them. More detailed findings of fact are set forth below.

David and Adam Elyachar ("Adam" and together with David, Joseph, Michael, and BBKC, the "Elyachar Litigants") started the BBOA carpet franchise in the 1980s. In 2015 and 2016, David agreed to sell seventy percent (70 %) of his BBOA shares to FAM, which is a Massachusetts limited liability company managed by Virga. In December 2015, David and FAM signed a letter of intent ("LOI") which set forth the terms of the sale. In theory, after the sale, the remaining thirty percent (30%) of BBOA would be owned by Joseph, Michael and Bradley Cotlar ("Cotlar") and David would continue to operate Kansas City area BBOAs through a separate company, BBKC.. The LOI also specified various rights and obligations of the parties going forward which were to be memorialized in the agreements to be signed in connection with the purchase, including that: BBOA would pay BBKC a consulting fee; BBOA

would pay dividends or partner's distributions; the BBOA system and brand would continue and be expanded, and would not be diluted through Virga's ownership of any other brands; and the terms of BBKC's royalty payments.

In January 2016, David sold his interest to FAM pursuant to a Stock Purchase Agreement (the "Stock Purchase Agreement"). As part of the stock purchase transaction, FAM paid a portion of the sale price up front and executed a promissory note for the remainder in favor of David (the promissory note had been paid in full). At the same time, BBOA, FAM, David, Joseph, Michael and Cotlar entered a stockholder's agreement (the "Stockholder's Agreement"). There were three other agreements entered contemporaneously with the Stock Purchase Agreement which were attached as exhibits thereto: (1) a consulting agreement, between BBOA and BBKC, which addressed David's consulting role (the "Consulting Agreement"); (2) a franchise agreement between BBOA and BBKC (the "Franchise Agreement"); and (3) a so-called a "napkin agreement" between David and Virga, as managing member of FAM, related to the Franchise Agreement between BBOA and BBKC. These three agreements will be referred to collectively as the "Sale Contracts."

It is alleged that to induce David to sell his shares to FAM, Virga made oral representations to him, including that: (1) Virga would not enforce any non-compete restrictions against BBKC, David, and Adam in the event the business relationship with BBOA soured; (2) BBOA would make distributions to David's sons who owned BBOA stock; (3) BBOA would make rebate payments for BBKC purchasing inventory from preferred vendors; (4) the royalty structure would be as agreed to in the LOI; (5) BBOA would not make cash calls to Joseph and Michael; (6) Joseph's and Michael's stock would not be diluted; (7) Virga could take a normal salary in conjunction with BBOA, but could not put personal expenses through the business, and

all income and expenses would be disclosed in financial statements; and (8) BBOA and the "Big Bob's" brand would be expanded, and that all acquisitions, expansions, and startups of all things flooring - both wholesale and retail- and including kitchen, cabinet, countertop, and paint businesses would be under the "Big Bob's" brand.

David thought it was important for the sale be completed before a trade show that both he and Virga would be attending in Las Vegas from January 19-22, 2016 so he could issue a press release and announce the sale at the show. Virga represented to David that all the provisions contained in the LOI and his oral representations had been included in the various agreements and therefore, David signed those agreements. David eventually sold his interest in BBOA to his two sons, Joseph and Michael.

Ultimately, the business relationship between Joseph and Michael and FAM/Virga broke down over FAM's alleged failure to expand the Big Bob's brand. Consequently, the parties have filed multiple actions against each other— in addition to the instant actions, there are suits pending in Missouri and Kansas state courts seeking declaratory judgment, mandamus, and an accounting and/or alleging claims for breach of various agreements, unjust enrichment, negligent and fraudulent misrepresentation, breach of the duty of good faith and fair dealing, breach of fiduciary duty, minority shareholder oppression/judicial dissolution. The BBOA Litigants (defendants in the Missouri and Kansas state court actions) invoked 9 U.S.C. § 4 and notified the Elyachar Litigants in those respective actions that their cases were subject to arbitration under the FAA. After the Elyachar Litigants declined to pursue arbitration in those cases, the BBOA Litigants filed the instant petitions to compel arbitration with this Court. The next day, the BBOA Litigants filed motions to arbitrate in the pending Kansas and Missouri state court actions.

**Standard of Review**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559, 127 S.Ct. 1955 (2007).  The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009). The standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. The Court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." *Rhodes v. Ocwen Loan Servicing, LLC*, 44 F.Supp.3d 137, 139 (D.Mass. 2014) (quoting *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1ˢᵗ Cir. 2007)). A claim is facially plausible if the factual content 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 550 U.S. at 665, 129 S.Ct. 1937.

**Facts**

The Letter of Intent

Virga signed the LOI to purchase from David all of the shares of Class A non-voting Common Stock and seventy percent (70 %) of the shares of  BBOA Class B non-voting stock. The LOI provided that the purchase price would be $750,000 with a $250,000 down payment and personal guaranty by Virga. Joseph, Michael and Cotlar would each retain 10% of the shares in Class B non-voting stock or have 10% non-voting membership if the corporation were converted into an LLC. BBOA would pay BBKC a consulting fee of $5,000 per month. BBOA would maintain a dividend policy in which the company would pay dividends or partner's distributions as required by franchise law and the IRS and would only retain profits as required by law, or at a maximum of 25% of net income whichever is less. Joseph, Michael and Cotlar

5

would sit on all strategic meetings and on board of directors for life (or as long as they are shareholders or members). David, Joseph, Michael and Cotlar would sign non-competition agreements providing that if they leave BBKC, they could not compete in the flooring franchise, cooperative, affiliation or mill affiliation business nor any other flooring group business for a period of 7 years. Virga would take a normal salary in conjunction with the work he performs for BBOA and BBOA would pay normal operating expenses and neither Virga nor his family would put personal expenses through the business. Shares of BBOA held by Joseph, Michael and Cotlar would not be diluted in any manner except if there were a requirement for additional liquidity (in which case the company would comply with its governing documents). The LOI also provided that BBKC would sign a Franchise Agreement which would have a term of 7 years and would automatically renew at its option. BBOA would receive no royalty on the first $4.5 million of net volume, after which it would pay a .75% royalty on all net sales  (as defined therein). The LOI included the following statement "Nothing in this Letter of Intent shall be binding except for the Confidentiality Provisions." The LOI is governed by the laws of the state of Kansas.

### The Stock Purchase Agreement

The Stock Purchase Agreement was entered into between David and FAM on January 15, 2016. Pursuant to that agreement, FAM purchased 100% of the Class A voting stock of (8, 500 shares), and seventy percent (70%) of the Class B non-voting common stock (7,000 shares) of BBOA from David for $750,000.[1] FAM was to pay $250,000 to David at the time of the closing and the remaining $500,000 was to be paid over time in accordance with a promissory note issued by FAM in favor of David, and a personal guaranty issued by Virga in favor of David. The Stock Purchase Agreement provided that all of the officers and directors of the company

---

[1] David owned 9,346.67 shares of the 10,000 outstanding shares of Class B non-voting common stock.

would resign on upon the completion of the closing. The agreement further provided that

Michael, Joseph and Cotlar would remain advisory members of BBOA board of directors until

such time that they no longer owned any shares therein.

The Stock Purchase Agreement included a choice of law provision which provided that

Massachusetts law governed the terms of the agreement and included an arbitration provision

which provided, in relevant part, as follows:

> All parties agree that any dispute, claim or disagreement arising under, out
> of or related to this [Stock Purchase] Agreement and the rights and obligations of
> the parties hereunder shall be resolved by arbitration in … Massachusetts using
> the Commercial Arbitration Rules and a single, mutually agree upon, arbitrator …

The Stock Purchase Agreement also contained an integration clause which provided that the

agreement reflected the entire understanding of the parties and that it superseded all prior

agreements and understandings.

### The Stockholders' Agreement

On January 16, 2016, FAM, Cotlar, Joseph, Michael, and David entered into a

Stockholders' Agreement relating to their shares of BBOA. The agreement provided that

management of BBOA was vested in the shareholders of  Class A Common Stock and such

shareholders had the right to vote at all meetings of the board of directors. Class B Common

Stock shareholders, on the other hand, were entitled to receive distributions of corporate profits

"which shall be paid or distributed no less than annually" in accordance with the terms set forth

in the agreement.  Class B shareholders were also entitled to attend and participate in all board of

directors' meetings but were not entitled to vote except with respect to matters specifically

requiring approval of Class B shareholders.  Additionally, upon dissolution or liquidation of the

company, Class B shareholders were entitled to receive the property and assets of thereof after

payment of all debts. At the time of execution of the Stockholders' Agreement, ownership of the

shares was as follows: FAM owned 8,500 shares of Class A Common Stock (100 %) and 7,000 shares of Class B Common Stock (70 %); David owned 2,346.55 shares of Class B Common Stock (23.46%); Cotlar owned 217.78 shares of Class B Common Stock (2.18 %); Joseph owned 217.78 shares of Class B Common Stock (2.18 %); and Michael owned 217.78 shares of Class B Common Stock (2.18 %).[2] The Stockholders' Agreement included an anti-dilution provision which upon the issuance of additional securities permitted each of the stockholders to purchase such shares and or securities offered in proportion to such shareholder's respective interest in the corporation at the time of the offer.  As to distribution of the profits, the agreement set forth the order in which net profits, net losses, net cash flow and net proceeds of corporation or its assets upon liquidation would be allocated among the shareholders (first, to repay any shareholder loans, and then divided among the shareholders in accordance with the number of shares owned). Furthermore, the agreement provided:

> distributions of corporate profits shall be distributed annually, or more frequently to the Class B shareholders in such amounts as shall be determined by the corporate President except that the Corporation shall not retain more than twenty-five percent (25%) of annual profits without the unanimous approval of all Class B shareholders unless required by State law … .

The Stockholders' Agreement includes an arbitration provision which providea that:

> All parties agree that any dispute, claim or disagreement arising under, out of or related to this Agreement shall be resolved by arbitration by the American Arbitration Association ("AAA") at its offices in Boston, Massachusetts under its commercial arbitration rules … .

The Stockholders' Agreement did not contain an integration clause.

---

[2] I was acknowledged in the agreement that by the end of 2017, David would sell all of his shares to Cotlar, Joseph and Michael.

<u>The  Consulting Agreement and the Franchise Agreement</u>

On January 15, 2016, BBOA entered into a Consulting Agreement with BBKC pursuant to which BBKC would serve as a consultant to BBOA from February 1, 2016 through January 31, 2021 in return for a consulting fee of $5,000 per month. There were no forum selection or arbitration provisions contained in the agreement, but the agreement provided that it was to be considered in conjunction with the Stock Purchase Agreement and the Stockholders' Agreement.

Also on January 15, 2016, BBOA and BBKC entered into a Franchise Agreement. The Franchise Agreement provided that each month BBKC would pay to BBOA a non-refundable royalty fee for each store it operates of 1% of gross sales (as defined in the agreement) of the individual stores. The Franchise Agreement contained a covenant not to compete which prohibited BBKC during the term of the agreement from engaging as an owner,  partner, director, officer, employee, consultant, agent, independent contractor or any other capacity in any other business selling the same products sold by BBOA as specified therein without prior written approval of BBOA which would not be unreasonably withheld. After termination or expiration of the Franchise Agreement, with limited exceptions, for one year, BBKC was prohibited from engaging directly or indirectly by virtue of being as an owner, proprietor, partner, director, officer, stockholder, employee, manager, consultant, independent contractor, salesperson, representative, investor, or agent or any other capacity, or through family relationships, or by financing and/or investing, or by consulting, advising or assisting or being associated in any retail business selling the products specified therein within a thirty-mile radius of any BBOA.  Moreover, after termination or expiration of the Franchise Agreement, BBKC is prohibited from engaging as an owner, partner, director, officer, employee, manager, consultant, salesperson, representative, investor or agent or in any other capacity with a business that

resembles BBOA in any manner. The Franchise Agreement contains an integration clause which provides that the agreement (including any addendums) is the entire agreement between the parties and that it supersedes all other representations, inducements, promises or agreements between them oral or otherwise, prior or contemporaneous. The Franchise Agreement is to be governed by and interpreted with the laws of the state of Kansas and all actions or proceedings arising out of or in connection therewith must be tried exclusively in Kansas.

There was a separate hand-written agreement relating to the Franchise Agreement also signed by BBOA and BBKC on January 15, 2016 (the so-called "napkin agreement") which provided that BBKC would pay a 1 % royalty for 18 months and thereafter, would pay a royalty recalculated  at .75% of BBKC volume above 2015—any over payment would be refunded over the next 18 months ending with being even by January 15, 2018.

<u>The Kansas and Missouri Litigations</u>

On May 22, 2020, Joseph and Michael filed suit against the BBOA Litigants in Jackson, County Missouri  (the "Jackson County Action") alleging claims for breach of contract (the Stockholders' Agreement); breach of the duty of good faith and fair dealing (the Stockholders' Agreement); fraudulent misrepresentation; accounting; breach of fiduciary duty; minority shareholder oppression/judicial dissolution; and mandamus.  Also on May 22, 2020, David, Adam and BBKC filed an action against the BBOA Litigants in the District Court of Johnson County, Kansas ("Johnson County Action")  alleging, among other claims, breach of the Franchise Agreement, breach of the Consulting Agreement, unjust enrichment, and negligent and fraudulent misrepresentation.  Generally,  they  allege Virga induced David to sell him his shares of BBOA by promising to expand the "Big Bob's" brand, but instead Virga expanded his own

FAM brand at the expense of David, Adam, Joseph, Michael and Cotlar and in doing so, breached various agreements among the parties.

On July 23, 2020, the BBOA Litigants filed two separate actions in this Court: the BBOA Litigants filed a petition to compel Joseph and Michael to arbitrate the Jackson County Action (No. 20-11379-TSH), and Virga and FAM filed a petition to compel David and BBKC to arbitrate the Johnson County Action (No. 20-11381-TSH). On July 24, 2020, the BBOA Litigants filed with the Missouri state court a motion to dismiss for lack of personal jurisdiction or alternatively, stay the Jackson County Action pending arbitration[3].  On October 22, 2020, that court denied FAM's and Virga's request to dismiss the action for lack of personal jurisdiction after finding that as purchasers of BBOA (a Missouri corporation), they should have reasonably anticipated being sued in Missouri. The court also denied the BBOA Litigants motion to stay the case in favor of arbitration after finding that the claims against them do not arise out of the Stockholders' Agreement and therefore, are not subject to the arbitration clause contained therein. *Appeal denied on jurisdictional grounds, see Elyachar v. Big Bob's Flooring Outlet of America, Inc.*, WD84118 2021 Mo.App. Lexis 865 (Ct. App. MO. West .Distr.Div .III  Sep. 21.2021).[4]

---

[3] BBOA did not join that part of the motion which sought a dismissal based on lack of personal jurisdiction.

[4]  The appellate court found that the BBOA Litigants had not filed a motion to compel arbitration or otherwise determine the arbitrability of claims asserted against them in the Jackson County Action, rather they had requested the lower court stay the Jackson County Action while this Court determines the arbitrability issue. More specifically, the appellate court held that because the issue before the lower court was whether to hold the Jackson Court Action in abeyance while another court determined arbitrability, it did not have jurisdiction over the appeal and dismissed it.  However, the motion and supporting memoranda when read together clearly asked the lower court to determine whether the claims are arbitrable and the lower court in the Jackson County Action and as discussed below, the court in the Johnson County Action (addressing an identical motion), addressed and made specific findings as to whether the claims asserted in those cases were arbitrable— that is, the courts in deciding the issue of whether a stay was warranted specifically addressed whether the claims asserted in those cases were in fact subject to arbitration under the various agreements between the parties. Therefore, regardless of how the issue was framed, the Missouri and Kansas state courts have, for all intents and purposes, already rule on the arbitrability issue.

Also on July 24, 2020, the BBOA Litigants filed a motion in the Johnson County Action (in Kansas state court) seeking to dismiss (for lack of personal jurisdiction) or alternatively to stay the case pending arbitration. On April 15, 2021, the court granted the motion to stay pending arbitration after finding that the claims asserted were sufficiently broad to "'relate to' issues designed for the arbitral forum chosen by the parties," and further that "[t]he nature and extent to which any such parties or claims survive that forum is best left, in the first instance, to the arbitrator." The court declined to address the personal jurisdiction issue. *Elyachar v. Bib Bob's Flooring Outlet of America, Inc., et al.*, Case No. 20CV2181, *slip op.* (Dis.Ct. Johnson County Kans.. Apr. 15, 2021). It is not clear whether this ruling is being appealed and if so, whether a Kansas appellate court would find that it had jurisdiction to rule on such appeal. *See supra note*, 4.

### Discussion

BBKC and David assert that FAM and Virga's petition to compel arbitration (No. 20-11381-TSH) should be dismissed for lack of jurisdiction for failure to name a required and indispensable party (BBOA) who would destroy diversity jurisdiction, or, in the alternative, this Court should abstain under *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236 (1976)*.* Joseph and Michael assert that the BBOA Litigants' petition to compel arbitration (No. 20-11379-TSH) should be dismissed, or alternatively stayed because this Court should abstain from ruling thereon pursuant to *Burfuord v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098 (1943) and/or the *Colorado River* doctrine.

Before addressing the merits of the motions to dismiss, the Court notes that *all* parties have manipulated the pleadings in this case and the pending state court cases to avoid the application of arbitration provision *to which they agreed,* or to compel arbitration regarding matters which were

not part of the bargain. Moreover, it was the parties who through their own ineptitude entered into multiple agreements which have inconsistent arbitration provisions and forum selection clauses. The result being that in the middle of a pandemic with judicial resources being pushed to their limits, these parties are tying up three different courts in three different jurisdictions to litigate claims arising out of the same transaction.  Moreover, the parties' specious attempts to point the fingers at each other as to how they ended up with this "piecemeal litigation"  is disingenuous and it should go without saying, neither side should be taking the high road regarding the jurisdictional quagmire they have created.

<u>Whether FAM's and Virga's Petition (No. 20-11381-TSH) should be Dismissed for Lack of Subject Matter Jurisdiction</u>

BBKC, David and Adam brought suit against FAM, Virga and BBOA in Kansas state court (the Johnson County Action). In that action, BBKC, Adam and David assert claims against the BBOA Litigants for breach of contract (the Franchise Agreement and the Consulting Agreement), unjust enrichment, negligent and fraudulent representation (which relate to the various sale documents) and they seek a declaratory judgment (relating to the Franchise Agreement).  FAM and Virga have filed a petition in this Court to compel BBKC and David to arbitrate those claims in Massachusetts in accordance with the requirements of Stockholders' Agreement and the Stock Purchase Agreement.  David and BBKC assert that the petition should be dismissed because BBOA should be joined as a necessary and indispensable party thereto under Fed.R.Civ.P. 19, and once joined, its presence would destroy diversity jurisdiction. FAM and Virga argue that BBOA is not an indispensable party because although it is a party to the Johnson County Action, it is not a necessary party and/or indispensable party to the instant action to compel arbitration.

Rule 19 of the Federal Rules of Civil Procedure addresses circumstances in which a case is going forward without all parties who may have interests related thereto. "It provides for the joinder of such 'necessary' parties when feasible. It then provides for the dismissal of suits when the court determines that the joinder of the 'necessary' parties is not feasible, but that they are , nonetheless, so 'indispensable' that the suit must not be litigated without them." *Picciotto v. Continental Cas. Co.,* 512 F.3d 9, 15 (1st Cir. 2008)(internal citations omitted). "In proceeding with its inquiry into both necessity and indispensability, a district court should keep in mind the policies that underly Rule 19, 'including the public interest in preventing multiple and repetitive litigation, the interest of the present parties in obtaining complete and effective relief in a single action, and the interest of absentees in avoiding the possible prejudicial effect of deciding the case without them.' " *Id.*, at 15-16.

 Rule 19 sets forth a two-step inquiry for courts to apply in  determining whether a party is "necessary" and "indispensable." The first question under Rule 19(a) is "whether a party is necessary to a proceeding because of its relationship to the matter under consideration." *Teamsters Local Union No. 171 v. Keal Driveaway Co.,* 173 F.3d 915, 917 (4th Cir.1999). Second, if the party is necessary but joining it to the action would destroy complete diversity, the court must decide under Rule 19(b) "whether the proceeding can continue in that party's absence." *Id.* at 917–18. Rule 19 is not formulaic and decisions "must be made pragmatically, in the context of the 'substance' of each case," *id.,* and courts must take into account the possible prejudice "to all parties, including those not before it," *Owens–Illinois, Inc. v. Meade,* 186 F.3d 435, 441 (4th Cir.1999). While the dismissal of a case is a "drastic remedy [that] should be employed only sparingly," it is required if a non-joined party to the dispute is both necessary and indispensable. *Keal,* 173 F.3d at 918.

14

In this case, there is a dispute as to whether the claims asserted by David and BBKC in the Johnson County Action are subject to arbitration under various agreements relevant to that action and the need generated by arbitration provisions contained in those agreements for BBOA to be a part of this case. Initially, the Court must focus on whether BBOA is a necessary party who was not joined in the petition. A party might be necessary under either Rule 19(a)(1)(A) or (B). Under Rule 19(a)(1)(B), which provides that a non-joined party is necessary to an adjudication if it "claims an interest relating to the subject of the action" and its absence would either conflict with its "ability to protect the interest," or "leave an existing party subject to substantial risk of incurring ... inconsistent obligations because of the interest." Rule 19(a)(1)(B)(i),(ii).

First, Rule 19(a)(1)(B)(i) directs the court to consider a non-joined party's ability to protect its own interests. BBOA has a direct pecuniary interest in the dispute as David and BBKC have asserted claims against it for breach of contract (the Franchise Agreement and the Consulting Agreement), unjust enrichment, misrepresentation (negligent and fraudulent), and have requested a declaratory judgment that BBKC be permitted to operate as a franchise independent of BBOA's control. BBOA has appeared in the Johnson City Action and is actively contesting those claims and in fact, has filed a motion addressing whether such claims are arbitrable. While I agree with Virga and FAM that joint tortfeasors from a state court proceeding are not automatically necessary parties to a federal case under Rule 19, BBOA's interest extends even beyond the possibility of tort liability. On the other hand, FAM and Virga are seeking to compel arbitration with respect to tort claims and breach of contract claims that are not expressly arbitrable under the terms of the agreements in question (the Franchise and Consulting Agreements) on the grounds that such claims implicate or relate to the Stock Purchase

Agreement and the Stockholders' Agreement that contain express arbitration provisions. If this Court determines that all such claims are arbitrable, that ruling could have a significant impact on the BBOA's potential liability in the Johnson County Action. Under the circumstances, fairness requires that BBOA be joined as necessary party to protect its own interests.

Rule 19(a)(1)(B)(ii) is a separate basis for finding a non-joined party necessary and protects the existing parties to the action from "incurring ... otherwise inconsistent obligations because of the [non-joined party's] interest." The existence of two concurrent proceedings here creates a "high likelihood" that one or more of the parties will be subject to conflicting obligations. Indeed, when considering the Jackson County Action, in which BBOA is also a party, the potential conflict becomes clear. More specifically, if I deny the motion to dismiss, I will ultimately be required to determine whether the Johnson County Action claims are arbitrable. The Kansas state court has already addressed the issue and determined that the claims are arbitrable and the matter should be stayed (presumably pending this Court's resolution). It is not clear to the Court if that ruling is being appealed but recall the lower court in the Jackson County Action determined that the claims in that action are not arbitrable and denied the requested stay.[5] If I ultimately address the petition and deny it, we will be left with the Kansas state court ruling that the arbitration clause is enforceable while I find it unenforceable. Finally, unlike in this case, BBOA is present as a party before the Kansas state court. That court was and remains, therefore, better positioned to consider BBOA's interests. Overall, I find that having

---

[5] The Missouri appellate court interpreted the lower court's ruling as a denial of a stay pending ruling by this Court rather than a denial of arbitrability. However, the lower court has made clear that it does not find the claims arbitrable. The different rulings by the Missouri and Kansas state courts highlights the potential for actual conflict regardless of whether those courts would adhere to this Court's ruling.

BBOA absent from this case might lead to inconsistent results and add an unnecessary layer of complexity. For the reasons stated, I find that BBOA is a necessary party under Rule 19.[6]

Joinder of BBOA as a party would destroy complete diversity. Therefore, applying the applicable four factors, I must decide whether it is "indispensable" to this case. Rule 19(b) provides that if a necessary party cannot be joined without destroying jurisdiction "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."   The first factor addresses the extent to which a judgment rendered in the BBOA's absence might prejudice the parties. This factor speaks to many of the same concerns addressed by the necessity analysis. *Keal,* 173 F.3d at 919. I have found that there is a probability of prejudice to the BBOA if I were to address the petition in its absence. BBKC and David also have an interest in having all of the parties together and adjudicating all of their claims before one tribunal.

The second factor considers the extent to which protective measures can be taken to lessen or avoid the prejudicial impact of proceeding in BBOA's absence. It is unclear to me how I would do so as different tribunals, *i.e.,* a court and an arbitration panel, might be required to rule on the validity of the arbitration provision and substantive claims, which could result in inconsistent judgments and conflicting obligations on the parties.

The third factor addresses the adequacy of a judgment rendered in BBOA's absence, which focuses on "the interest of the courts and the public in complete, consistent, and efficient settlement of controversies." *Provident Tradesman Bank & Trust Co. v. Patterson,* 390 U.S. 102,

---

[6] Rule 19(a)(1)(A) provides that a non-joined party is necessary when "the court cannot accord complete relief among existing parties." While based on my prior discussion I am inclined to find that I cannot afford complete relief without BBOA present as a party, having found BBOA is a necessary party under Rule (19)(a)(1)(B), it is not necessary for to address whether it is a necessary party under this provision.

111, 88 S.Ct. 733 (1968). Again, I find that there is the potential that multiple proceedings could produce incomplete, inconsistent, and inefficient rulings.

Finally, the fourth factor to be considered is whether VIA and FMA "would have an adequate remedy if the action were dismissed for nonjoinder." Fed.R.Civ.P. 19(b)(4). As is apparent from what I have described of the status of the Johnson County Action (where the court has already comprehensively addressed the arbitration issue), they would. The Kansas court is entirely capable of adjudicating the entirety of the dispute, including the issue of arbitrability. Moreover, all of the necessary parties are joined in that forum. The underlying suit arises wholly from state law. Simply put, there is no reason that why the Kansas state court will not provide an adequate remedy for *all* the parties in this case. For these reasons, the Court is inclined to find that  application of the four Rule 19(b) factors establishes that BBOA is indispensable to this case. However, the Court cannot ignore the long line of precedent cited in FAM's and Virga's opposition brief which holds that in a proceeding to compel arbitration, a party joined in a parallel state court action (tort or contract) that would destroy diversity jurisdiction is not an indispensable party under Rule 19 in a federal action to compel arbitration. *See Hermès of Paris, Inc. v. Swain*, 867 F.3d 321 (2ᵈ Cir. 2017)(noting that courts that have addressed the issue have uniformly adopted this position) *but see Tough Mudder, LLC v. Sengupta*, 614 Fed.Appx. 643 (4ᵗʰ Cir. 2015)(citing *Home Buyers Warranty Corp. v. Hanna,* 750 F.3d 427, 432 (4ᵗʰ Cir. 2014)). Because I find that the First Circuit would follow these cases, I find that BBOA is a necessary but not indispensable party and therefore, the motion to dismiss for lack of subject matter jurisdiction is denied.

<u>Whether the Court should Abstain from Addressing the Petitions Under *Colorado River*</u>

In both cases, the applicable Elyachar Litigants assert that the Court should abstain from addressing the petitions under the *Colorado River* doctrine.[7]  Under the *Colorado River* doctrine a court may abstain from a case under "exceptional circumstances."  The court applies eight factors in determining whether "exceptional circumstances" exist: (1) assumption by either state or federal court over a res; (2) geographical inconvenience of the forum; (3) avoidance of piecemeal litigation; (4) order in which jurisdiction was obtained by the forums; (5) whether federal or state law controls; (6) adequacy of the state proceedings to protect the parties' interests; (7) the vexations nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction. *Jiménez v. Rodriguez-Pagán*, 597 F.3d 18, 27-28 (1st Cir. 2010); *see also Colorado River*, 424 U.S. at 8188, 96 S.Ct. 1236. The ultimate decision "to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighed in favor of the exercise of jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16, 103 S.Ct. 927 (1983).  In making its decision the court must also take into consideration that abstention from "federal jurisdiction is the exception, not the rule," *see Colorado River*, 424 U.S.  at 813, 96 S.Ct. 1236, and that there is a national policy in favor of arbitration.

In these cases, I find that applying the seven relevant factors (factor eight is not applicable), exceptional circumstances exist such that abstention under *Colorado River* is warranted. As to the first factor, the state court has not assumed jurisdiction over any res or

---

7  In Case No. 20—11379-TSH, Joseph and Michael also argue that the Court should abstain pursuant to *Burford*. Because I find that abstention is appropriate under *Colorado River*, I will not address this other theory. Moreover, I find that both parties have failed to provide fully developed legal analysis regarding its applicability in this case.

property[8]. This factor does not favor abstention. As to the second factor, in case No. 20-11379, the plaintiffs in the Jackson County Action reside in Kansas which is in the same metropolitan area as the Missouri state court, while Virga splits time between Massachusetts and Florida. BBKC is a Kansas corporation and David and Adam would be required to travel if this Court does not abstain.  FAM is a Massachusetts company and Virga splits his time between Florida and Massachusetts—he would be required to travel if the Court abstains and may be required to travel (depending on where he is in residence at the time) if the Court does not abstain.  Similar logistics are present for case No. 20-11381-TSH. I find that this factor to be neutral, and therefore, that it does not favor abstention. I find that the third factor weighs in favor of abstention because piecemeal litigation could lead to conflicting results. The state court actions were filed months before the petitions filed in these cases and therefore, this factor favors abstention—indeed both state courts have addressed the arbitration issue and are further along procedurally. Analyzing factors five and six together, both state court cases involve questions of state law as to the underlying substantive claims. The issue of arbitrability invokes federal law, however, the state courts are fully capable of deciding arbitration issues pursuant to the FAA and have, essentially, already done so. Moreover, the state courts are adequate to protect the interests of all parties[9].  I agree that with respect to both cases, the actions of Virga, FAM and/or BBOA in bringing the instant petitions in this Court was vexatious. Indeed, not only did they file petitions to compel arbitration in this Court, the next day they filed motions to stay arbitration in

---

[8] I am not persuaded by Joseph and Michael's argument in Case No. 20-11379-TSH, with respect to the Jackson County Action, that their claim to dissolve BBOA, a Missouri corporation, equates to the court assuming jurisdiction over property (because resolution of that claim falls exclusively within the jurisdiction of the Missouri state court)

[9] Virga and FAM argue that the Missouri and Kansas state courts are not adequate forums because they lack personal jurisdiction over them. However, the Missouri state court denied Virga's and FAM's  motion to dismiss for lack of personal jurisdiction and the Kansas state court did not find it necessary to address the issue. Virga's and FAM's undeveloped, conclusory statements in their oppositions that the state courts lack personal jurisdiction over them are not sufficient to establish that the state courts are inadequate forums.

the parallel state court actions which, as framed, required the courts to make a determination regarding arbitrability. Weighing the factors in both cases, I find that the *Colorado River* doctrine favors abstention. Accordingly, the petitions to compel arbitration filed in case Nos. 20-11379-TSH and 20-11381-TSH are dismissed.

<u>Conclusion</u>

1. In case No. 20-11379-TSH, Defendants' Motion to Dismiss (Docket No. 9) is ***granted***; and

2. In case No. 20-11381-TSH, Defendants' Motion to Dismiss Under Fed.R.Civ.P. 12(b)(1) (Docket No.12) is ***granted***.

**SO ORDERED.**

*/s/ **Timothy S. Hillman***
TIMOTHY S. HILLMAN
DISTRICT JUDGE